UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 MAY 17 P 5: 52

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| ARIEL FALCON | ) | |
|---|---|---|
| Plaintiff | ) | CIVIL NO.: 3:01CV01995 (AHN) |
| v. | ) | |
| JOHN J. ARMSTRONG, ET AL, | ) | |
| Defendants | ) | |

May 14, 2004

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**I.   FACTS:**

The Plaintiff seeks to recover for alleged civil rights violations that occurred while he was confined to the custody of the Connecticut Department of Corrections (Hereinafter DOC). The Plaintiff, Ariel Falcon, was a DOC inmate at the time. The Defendant, New Opportunities for Waterbury, Inc. (Hereinafter NOW) is a community non-profit corporation that contracted with the DOC to implement a work release program through the DOC. NOW employed James Gatling, Jacqueline Mobley and James Murphy as executive director, residence coordinator and senior case managers.

The Plaintiff claims that while he was an inmate he was assigned to the NOW work release program from September 28, 2001, through November 2, 2001. During the approximate month Plaintiff was in the NOW work release program, Plaintiff failed to seek employment, as he was required to do. The Plaintiff was therefore removed from the NOW program and returned to incarceration by the DOC. While the Plaintiff was in the NOW work release program he requested permission to seek medical treatment from providers outside the DOC. NOW accommodated the Plaintiff's request and he was

1

permitted to seek medical treatment outside of DOC and further was provided transport by a NOW "monitor" to St. Raphael's Hospital. Plaintiff alleges he was scheduled for surgery on November 5, 2001. The Plaintiff claims that he was removed from the work release program on November 1, 2001, by these Defendants and therefore unable to attend this alleged surgical procedure. The work release program contemplates that inmates will make concerted efforts to find community employment. Contractually, NOW acknowledges and agrees that the DOC and its designees maintain responsibility for inmates participating in the work release program.

The work release program contemplates that medical services will be provided through the DOC pursuant to the State of Connecticut Health Services Protocol. This protocol calls for inmates to receive medical care through the University of Connecticut Health Center, Correctional Managed Health Care System (UCHC/CMHCS) or private providers. The DOC operates as a gatekeeper to regulate the inmate medical services that the DOC will reimburse. An inmate may elect to receive medical services outside the system at the inmate's own expense. See attached contract, medical service protocols and affidavit, previously submitted in Defendants' Motion to Dismiss dated January 14, 2003 and Supplemental Brief dated January 15, 2003.

NOW does not provide any medical services for inmates. NOW is not responsible to provide medical care for the Plaintiff. NOW does arrange for transportation of inmates currently within the work release program to medical service providers whether such providers are at the UCONN Medical Center for DOC provided medical service or to an outside medical provider. See attached affidavit and protocol.

On October 23, 2001, NOW arranged for the transport of the Plaintiff to St. Raphael's Hospital for medical care. There is no claim that either NOW or its employees provided this transport in any improper manner.

On November 1, 2001, the Plaintiff was removed from the program due to his failure to find employment. See attached affidavit. The Plaintiff was no longer a participant of the work release program and NOW was therefore no longer involved in transporting the Plaintiff for medical treatment for the alleged appointment of November 5, 2001.

In pertinent part, the Plaintiff claims that he suffers from renal cancer and a testicular growth. The DOC released the Plaintiff from incarceration on December 0f 2001. The Plaintiff next sought medical treatment for his testicular symptoms in April of 2002. See Plaintiff's deposition at pp. 74-75.

With respect to the discovery of this matter:

1. Judge Nevas ordered on May 22, 2003, that all discovery be completed on or before July 31, 2003. Discovery in this matter is not complete as the Plaintiff has failed to disclose any expert witness in support of his claim. The Defendants then require sufficient time to investigate and potentially depose any such expert as well as disclosing their own expert(s).

2. Judge Fitzsimmons ordered that the Plaintiff provide the Defendants with a specific expert disclosure of his proposed expert witness(es) as to the medical causation on two occasions. The Plaintiff was initially ordered to disclose

3

such expert witness no later than December 2, 2003. The Plaintiff was then ordered to disclose his expert witness no later than February 8, 2004; and,

3. The Plaintiff has yet to comply and has heretofore failed to identify and disclose with specificity anyone who will testify that the Plaintiff's medical problems are causally related to the acts or omissions of these Defendants.

II. **ARGUMENT:**

**A. THE PLAINTIFF HAS FAILED TO COMPLY WITH THREE COURT ORDERS AND TO DATE HAS NOT DISCLOSED AN EXPERT WHO WILL OFFER AN OPINION THAT NOW OR ITS EMPLOYEES CAUSED OR EXACERBATED THE PLAINTIFF'S CONDITION.**

Federal Rule of Civil Procedure, Rule 37(b)(2)(C) provides that the court may issue an order dismissing the action should a party fail to comply. The Rules of the United States District Court for the District of Connecticut, Rule 41 provides that in action in which the deadlines established by the court pursuant to Rule 16[1] are not met, the action may be dismissed.

There is no question but that the Plaintiff has failed to comply with three separate court orders concerning completion of discovery and disclosure of expert witnesses.

Moreover, given the nature of the facts as set forth above, it would seem incredible that the Plaintiff could ever actually identify an expert that would give an admissible opinion that whatever treatment, if any, was scheduled for November 5, 2003, would in any way have cured or limited the Plaintiff's current condition, whatever that is.

---

[1] It is not stated within Judge Nevas' order of May 22, 2003 whether it was pursuant to Rule 16.

4

**B. EXPERT TESTIMONY IS REQUIRED TO PROVE THAT THE PLAINTIFF'S ALLEGED RENAL CANCER AND TESTICULAR GROWTH WAS CAUSED OR EXACERBATED BY THE ACTS OR OMISSIONS OF THESE DEFENDANTS.**

"To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct 'legally caused' the injuries. . . . The first component of 'legal cause' is 'causation in fact' . . . [which] is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." Doe v. Manheimer, 212 Conn. 748, 757, 563 A.2d 699 (1989), overruled in part on other grounds, Stewart v. Federated Dept. Stores, Inc., 234 Conn. 597, 608, 662 A.2d 753 (1995); Poulin v. Yasner, 64 Conn. App. 730, 734-35, 781 A.2d 422 (2001).

Connecticut recognizes a cause of action for lost chance. Typically such cases arise in the medical malpractice setting. Therein a plaintiff must prove his entitlement to recover based upon lost chance by providing evidence that would lead a jury to the reasonable conclusion that, more probably than not, the defendant's negligence was the direct and proximate cause of a decrease in the chance of successful treatment of the plaintiff's injury. LaBieniec v. Baker, 11 Conn. App. 199, 207, 526 A.2d 1341 (1987); see also Law v. Camp, 116 F. Supp.2d 295, 305 (D.Conn. 2000). In Connecticut, such cases follow a traditional approach in the determination of proximate cause. Borkowski v. Sacheti, 43 Conn. App. 311; see also Wallace v. St. Francis Hospital & Medical Center, 44 Conn. App. 262; LaBieniec v. Baker, supra, 11 Conn. App. at 207; Law v. Camp, supra, 115 F. Supp. 2d at 305.

5

"Expert testimony is required when the question involved goes beyond the field of the ordinary knowledge of judges or jurors." LePage v. Horne, 262 Conn. 116, 125 (2002) (emphasis as in original).

"Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." Shegog v. Zabrecky, 36 Conn. App. 737, 745-46, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995); Poulin v. Yasner, 64 Conn. App. 730, 734-35, 781 A.2d 422 (2001).

Connecticut courts, to be sure, have recognized three exceptions where expert medical testimony is not required as to causation or proximate cause:

1. The courts have concluded that in medical malpractice setting expert testimony is required unless the facts show such a gross lack of care that warrants an almost conclusive inference of negligence. For example circumstantial evidence was found sufficient where the defendants left a needle in the plaintiff's abdominal wall during surgery and the needle caused the plaintiff pain and suffering necessitating further surgery); Puro v. Henry, 188 Conn. 305, 308, 308, 449 A.2d 176 (1982)

2. The second exception to the necessity for expert testimony occurs in the situation in which the medical condition is obvious. Id.; and,

3. The third exception to a need for expert testimony in lost chance cases revolves around whether lay jurors can resolve the issue by use of their common knowledge. If the

6

fact finders can answer the question at issue without expert opinion because it is within their common experience and need not be resolved by the use of peculiar or specialized knowledge, no expert testimony is required. Id. at 309.

It is clear from the facts of this case that in addition to issues related to duty, negligence, breach of any duty and damages, the Plaintiff must prove causation. The Plaintiff must submit expert testimony to show the delay in treatment or diagnosis was the proximate cause of his present condition. It does not seem probable that the Plaintiff could ever make such a showing. It undisputed that the Plaintiff was in the NOW program for only a little longer than one month. Can the Plaintiff possible demonstrate that whatever his present condition is, it would not exist but for one month delay in diagnosis and or treatment. Certainly if there is any truth to the Plaintiff's claims, there were ample opportunities for the Plaintiff to receive any pertinent treatment of diagnostics either before after his participation in the NOW program.

Lastly, the Plaintiff has testified that he had testicular pain before his is participation in NOW, while he was in the NOW program, after his return to DOC, after his discharge from DOC and after his surgery performed in 2002. Given these facts it can be hardly stated that the Plaintiff's testicular pain was effected during his participation with NOW.

### III. CONCLUSION:

The Plaintiff's Amended Complaint as to these Defendants should be dismissed based on the Plaintiff's failure to comply with the court's orders. Moreover, there is no allegation that the Plaintiff was denied medical treatment while he was within the work

release program. Any medical treatment that the Plaintiff was to be afforded while incarcerated by the DOC was subject to the DOC protocol and there is no allegation that NOW violated the aforesaid protocol. The Plaintiff will require expert testimony on the issues of causation and damages and he has failed to disclose any such expert in violation of the court's orders.

WHEREFORE, these Defendants respectfully request that this honorable court dismiss the Plaintiff's Amended Complaint as against these moving Defendants.

Respectfully submitted,
The Defendants,
James Gatling,
Jacqueline Murphy, and
Joseph Murphy,
By their attorney,

Sergio C. Deganis
Ouellette, Deganis, Gallagher & Ward, LLC
143 Main Street
Cheshire, CT 06410
Telephone (203) 272-1157
Federal Bar No.: CT 03080
sdeganis@odgwlaw.com

8

## CERTIFICATION

This is to certify that a copy of the forgoing has been mailed, postage prepaid, on May 14, 2004 to:

Ariel Falcon
Pro se
P.O. Box 8605
New Haven, CT 06531-0605

Richard T. Biggar, Esquire
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105

Diane Polan, Esquire
Law Office of Diane Polan, LLC
129 Church Street
Suite 802
New Haven, CT 06510

_____
Sergio C. Deganis

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - -x

ARIEL FALCON,                    )      COPY

    Plaintiff                ) 3:01CV01995(AHN)

        VS                   ) JUNE 25, 2003

JOHN J. ARMSTRONG, ET AL,        )

        Defendants               )

- - - - - - - - - - - - - - - -x

        Deposition of MR. ARIEL FALCON, taken pursuant to the Federal Rules of Civil Procedure, at Law Offices Of Ouellette, Deganis, Gallagher & Ward, LLC, 143 Main Street, Cheshire, Connecticut on Wednesday, June 25, 2003 at 2:25 p.m., before LOUISE E. BOUTEILLER, LSR (License #SHR.270), a Licensed Shorthand Reporter and a Notary Public in the State of Connecticut.

ARTHUR E. MOAN, JR. & ASSOCIATES, LLC      (203) 271-9277

2

```
 1
 2
 3
 4     A P P E A R A N C E S:
 5         LAW OFFICES OF DIANE POLAN
           BY:   PAUL GARLINGHOUSE, ESQ.
 6               129 Church Street, Suite 802
                 New Haven, Connecticut  06510
 7
                 Representing the Plaintiff
 8
 9         OUELLETTE, DEGANIS, GALLAGHER & WARD, LLC
           BY:   SERGIO C. DEGANIS, ESQ.
10               143 Main Street
                 Cheshire, Connecticut  06410
11
                 Representing the Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                              3
1

                          S T I P U L A T I O N S



            IT IS HEREBY STIPULATED AND AGREED by

   and between counsel for the respective parties

   hereto, that all technicalities as to the proof of

   the official character of the authority before

   whom the deposition is to be taken are waived.


            IT IS FURTHER STIPULATED AND AGREED by

   and between counsel for the respective parties

   hereto, that the deposition may be signed by the

   deponent before any Notary Public or Commissioner

   of the Superior Court.


            IT IS FURTHER STIPULATED AND AGREED by

   and between counsel for the respective parties

   hereto, that all objections, except as to form,

   are reserved to the time of trial.


                          o0o
```

49

1   Q   What illnesses do you presently claim that
2   you suffer from?
3   A   Neck pain, back pain, testicle pain; pain in
4   my legs.
5   Q   Yes.
6   A   Headaches.
7   Q   Which of those five illnesses or symptoms or
8   diseases or whatever it is, injuries, that they are,
9   which of those five do you claim were caused by NOW or
10  its employees?
11  A   NOW did not let me seek the medical
12  attention I needed for -- I had a lump on my right --
13  left stomach -- right stomach, I can't recall which side
14  it was on, infection; delayed my treatment for a severe
15  infection I was having at the time; delayed me to have
16  physical therapy for the van accident; delayed me to
17  have surgery for my testicle; delayed me to have tests
18  done on my kidneys.
19  Q   Okay.  The neck pain that you're presently
20  suffering from, did NOW cause that condition?
21  A   I believe they aggravated it.
22  Q   How did they aggravate it?
23  A   By not letting seek medical attention.
24  Q   Have you since had medical attention for
25  your neck pain?

50

10

| | | |
|---|---|---|
| 1 | A | Yes, I have. |
| 2 | Q | When was it that you first sought medical |
| 3 | | attention for your neck pain? |
| 4 | A | I'm not sure. It was while I was in NOW or |
| 5 | | right after my release. |
| 6 | Q | When did it first start? |
| 7 | A | 1999. |
| 8 | Q | So, you had neck pain from 1999 when you |
| 9 | | were in this car accident, right? |
| 10 | A | That's correct, sir. |
| 11 | Q | And that was continuous, that neck pain? |
| 12 | A | That's correct, sir. |
| 13 | Q | And you're saying that while you were in the |
| 14 | | Department of Corrections in 1999 through 2001 you had |
| 15 | | neck pain? |
| 16 | A | That's correct, sir. |
| 17 | Q | What's causing that? |
| 18 | A | I believe the injury that I sustained in the |
| 19 | | van accident. |
| 20 | Q | What is that? |
| 21 | A | What do you mean? I don't understand. |
| 22 | Q | What is the injury to your neck? |
| 23 | A | Striking the side of the van. |
| 24 | Q | What did that do to your neck? |
| 25 | A | Caused pain; caused stiffness. |

53

| | | | |
|---|---|---|---|
| 10 | 1 | A | Yes. |
| | 2 | Q | Prior to 1999, did you have any neck pain? |
| | 3 | A | Yes, when I got injured on-the-job. |
| | 4 | Q | When was that, sir? |
| | 5 | A | 1997, I believe. |
| | 6 | Q | And how did you get hurt on-the-job? |
| | 7 | A | When a man with a gun -- I was fleeing a man |
| | 8 | | with a gun. |
| | 9 | Q | Say that again. |
| | 10 | A | Floating (sic.) a man with a gun in my |
| | 11 | | official company with the Judicial Department. |
| | 12 | Q | You were chasing someone? |
| | 13 | A | Floating (sic.) him. |
| | 14 | Q | You were running from him? |
| | 15 | A | Correct. |
| | 16 | Q | And how did that cause you neck pain? |
| | 17 | A | I fell down the stairs. |
| | 18 | Q | Did you make a claim? |
| | 19 | A | Yes, I did. |
| | 20 | Q | And was that claim accepted? |
| | 21 | A | Yes, it was. |
| | 22 | Q | It was? |
| | 23 | | As a Workers' Compensation claim? |
| | 24 | A | Yes. |
| | 25 | Q | Is that claim still open? |

ARTHUR E. MOAN, JR. & ASSOCIATES, LLC    (203) 271-9277

                                                                        55

10    1         A    It got a little better.  It was livable.
      2         Q    Any other pain that you sustained, pain or
      3    injury that you sustained, in that fall down?
      4         A    I believe a back injury.
      5         Q    Treated with the same doctors for that?
      6         A    Yes.
11    7         Q    As part of the same claim, right?
      8         A    Yes.
      9         Q    And then did you injure your back again in
      10   1999 in the motor vehicle accident?
      11        A    Yes.
      12        Q    Describe the motor vehicle accident for me.
      13        A    That had happened on the Bridgeport
      14   Correctional complex grounds.  The driver was driving at
      15   an erratic rate of speed, decided to back out of a sally
      16   port that you could only pull forward in and struck
      17   another State vehicle on the property with the rear left
      18   of the van.
      19        Q    So, what kind of vehicle were you in?
      20        A    A van.
      21        Q    You're being transported by the Bridgeport
      22   Correctional --
      23        A    The Department of Correction, yes.
      24        Q    And you're being transported?
      25        A    That's correct.

59

11  1  Q Same accident?

   2  A 1999, yes.

   3  Q And what was the problem that you were

   4 diagnosed with in your left shoulder?

   5  A I believe just muscle spasm, tendons or

   6 something like that.

   7  Q A sprain, right?

   8  A Yes.

   9  Q Now, were you ever diagnosed as having

   10 sustained any type of herniated disc?

   11  A I can't recall, sir.

   12  Q Has anyone ever told you that you had some

   13 kind of spinal cord injury?

   14  A I don't have the tests results. I just --

   15  Q You don't --

   16  A I know I have some bulging problems and I

   17 believe a protruding disc, but I'm not sure.

   18  Q And when was it that you first suffered from

   19 any testicle pain?

   20  A Well, while I was incarcerated.

   21  Q Where, in '84?

   22  A No, sir, Cheshire Correctional Center, June

   23 of 2001, I believe, or 2000.

   24   I can't remember exactly whether it was 2000

   25 or.

ARTHUR E. MOAN, JR. & ASSOCIATES, LLC    (203) 271-9277

60

11  1    Q    Whether it was 2000 or 2001.
    2         And how did that develop?
    3    A    Massive pain in the kidney areas, hip, going
    4    into the groin area, testicles filling up with liquid;
    5    feeling masses on my left testicle.
    6    Q    So, it just happened naturally?
    7    A    Yes.
    8    Q    It wasn't a particular trauma that caused
    9    the testicular pain?
12  10   A    No, sir, not as far as --
    11   Q    Not as far as you know?
    12   A    No, sir.
    13   Q    And I see it's not a disease that you know
    14   of or do you?
    15   A    No, sir.
    16   Q    Have you ever been diagnosed with cancer in
    17   your testicles?
    18   A    No, sir.
    19   Q    Have you ever undergone surgery involving
    20   your testicles?
    21   A    Yes, I have.
    22   Q    When was that?
    23   A    I believe April 2002.
    24   Q    And what surgery was that?
    25   A    I had two appended testes that were

Case 3:01-cv-01995-HBF   Document 62-2   Filed 05/17/2004   Page 19 of 20

74

```
14   1        A    No, they provided me the transportation to
     2   and from my medical appointments.
     3        Q    Right.
     4             And you knew that the most they would do is
     5   provide you with medical transportation to provide you
     6   with doctors you want to see, true?
     7        A    That was my direction, that I would be able
     8   to go see doctors.
     9        Q    And they let you go see doctors?
    10        A    They took me to see them.
    11        Q    Right.  Did NOW prevent you from going to
    12   any of the doctors that you wanted to see while you were
    13   still in the NOW program?
    14        A    No.
    15                  MR. DEGANIS:  I want to take a five
    16                  minute break.
    17                  (Whereupon a recess was taken.)
    18   BY MR. DEGANIS:
    19        Q    Mr. Falcon, when was it that you were in the
    20   NOW program?
    21        A    I believe the end of September some time, I
    22   don't know the exact date.
    23        Q    What year, sir?
    24        A    2001.
    25        Q    And it was the end of September until
```

ARTHUR E. MOAN, JR. & ASSOCIATES, LLC    (203) 271-9277

75

14

```
 1   October?
 2       A    I don't know if it was October 30th or
 3   November 1st, I can't recall.
 4       Q    So, about a month?
 5       A    Yes.
 6       Q    And when was it that you had the surgery for
 7   your testicular issues?
 8       A    I believe it was April of 2002.
 9       Q    And when were you released from the DOC?
10       A    December 26th, 2001.
11       Q    And why is it that you waited four months
12   before you had the surgery?
13       A    I was being seen by different doctors at
14   different clinics.
15       Q    And so different doctors had different
16   opinions about how to treat you?
17       A    For different injuries.
18       Q    I'm talking about the testicular issues,
19   sir.
20       A    Well, I was seen by -- I believe it was Yale
21   Hospital an ultrasound was done and then I went to St.
22   Raphael Hospital and they confirmed what Yale Hospital
23   had confirmed and because it's a clinic, your
24   appointments are really spread out when they can see you
25   in a clinic.
```

15